# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

JOSHUA R. BELLA,

       **Plaintiff,**

    v.                                       **Case No. 19-CV-338**

DR. JEFFERY MANLOVE, *et al.*,

       **Defendants.**

---

## DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR ORAL ARGUMENT

---

*Pro se* plaintiff Joshua Bella filed a lawsuit in the Western District of Wisconsin, alleging that the defendants violated his civil rights at the Waupun Correctional Institution ("WCI"). (Docket # 1.) District Judge James Peterson allowed Bella to proceed with the following claims: (1) that Jeffery Manlove, Cheryl Jeanpierre, Emily Stadtmueller, Donna Larson, Nancy White, and Crystal Marchant showed deliberate indifference towards his serious medical condition by refusing to seek an "outside EDS specialist" for his Ehlers-Danlos Syndrome ("EDS"); (2) that the "current HSU manager" (Marchant) implemented a policy at WCI that forced inmates to share Transcutaneous Electrical Nerve Stimulator ("TENS") units and limited use to one hour; and (3) that Manlove, Jeanpierre, Stadtmueller, Larson, White, and Marchant provided negligent medical care under Wisconsin State law. (Docket # 8 at 5–7.)

Magistrate Judge Stephen L. Crocker transferred the case to this district on February 22, 2019. (Docket # 29.) The parties consented to magistrate judge jurisdiction on March 12,

2019. (Docket # 36 and Docket # 37.) Before me now are the defendants' motions for summary judgment and Bella's "motion for an oral argument." (Docket # 66, Docket # 75, and Docket # 84.)

## FACTUAL BACKGROUND

Bella is an inmate at WCI. (Docket # 68 at ¶ 1.) Defendants are or were medical care providers at WCI: Jeffrey Manlove is a doctor; Cheryl Jeanpierre was a "contracted" doctor between May 2018 and April 2019; and Donna Larson, Emily Stadtmueller, Nancy White, and Crystal Marchant are registered nurses who served as Health Services Managers ("HSM"). (*Id.* ¶¶ 7-10; *see also* Docket # 77 at ¶¶ 8–10.)

According to Bella, he has had EDS symptoms for over 22 years. (Docket # 86 at 24, ¶ 49.) EDS is a "group of connective tissue disorders" that can cause joint hypermobility (joints that stretch further than normal), skin hyper-extensibility (skin that stretches further than normal), tissue fragility, and decreased muscle tone. (Docket # 68 at ¶ 16; *see also* Docket # 77 at ¶¶ 12, 16.) Genetic testing is available to confirm EDS Types I, II, and IV, but there is no genetic testing available for EDS type III. (Docket # 68 at ¶¶ 17–18.) EDS type III is diagnosed based on personal medical history, family medical history, and physical findings. (*Id.*) It is the most benign form of EDS and often causes joint pain, but it is not associated with heart/aorta damage or decreased life expectancy. (*Id.* ¶¶ 19-20.)

In 2013, a geneticist at the Marshfield clinic diagnosed Bella with EDS Type III. (Docket # 68 at ¶ 23.) The following year, in August 2014, Bella arrived at WCI. (*Id.* ¶ 6.) Manlove examined Bella for the first time on September 2, 2014. (*Id.*) At that time, Bella had several prescriptions to treat his EDS: an oral medication (Cymbalta), an analgesic balm, and a TENS unit. (*Id.* ¶ 38.) Manlove ordered Bella to continue his current prescriptions. (*Id.* ¶

2

39.) He also ordered physical therapy, labs, an EKG, and x-rays. (*Id.*) The labs, EKG, and x-rays returned normal results. (*Id.*)

Several months later, on December 12, 2014, Manlove saw Bella regarding complaints of multiple joint pain from his EDS. (*Id.* ¶ 41.) Bella reported that he had stopped taking Cymbalta because it was making him depressed, so Manlove discontinued that medication on February 2, 2015. (*Id.* ¶ 42.) At that time, Manlove also requested authorization from the Department of Corrections ("DOC") to send Bella to the University of Wisconsin Hospital ("UW Hospital") for an EDS consultation. (*Id.* ¶ 42.) Manlove explained that he did not know of anyone devoted to exclusively treating EDS. (*Id.* ¶¶ 29–30.) He requested a referral and UW Hospital directed him to UW Orthopedics and UW Pain Management Clinic. (*Id.*)

On February 16, 2015, Manlove saw Bella regarding complaints of chronic pain. (*Id.* ¶ 43.) He prescribed a six-month trial of Nortriptyline and referred Bella to physical therapy to fit braces. (*Id.* ¶ 44.) Bella later reported that he stopped taking the Nortriptyline because it was making him depressed/suicidal, so Manlove discontinued the medication on March 13, 2015. (*Id.* ¶ 46.) Instead of prescribing something different at that time, Manlove decided to wait for a recommendation from the UW orthopedist. (*Id.*)

The UW orthopedist evaluated Bella on May 4, 2015. (*Id.* ¶ 47.) He prescribed weekly physical therapy for Bella's shoulders and hips but did not recommend any medication. (*Id.*) Later that month, on May 29, 2015, Manlove prescribed lidocaine cream for pain management. (*Id.* ¶ 49.) Manlove renewed the prescription in July 2015 and September 2015. (*Id.* ¶ 52.) On June 3, 2015, Bella began physical therapy. (*Id.* ¶ 50.)

On June 24, 2015, Former HSM Ann Scarpita discontinued Bella's prescription for the TENS unit. (*Id.* ¶ 85.) Scarpita wrote "you have received . . . a TENS unit to assist with

your pain and yet you have altered the wires and the unit against instruction, thus resulting in the loss of this unit." (*Id.* ¶ 86.) The following month, on July 31, 2015, Scarpita issued a memo to all security staff informing them that they would need to collect all TENS units from the cell halls.[1] (*Id.* ¶ 87.) The memo stated that TENS units would be handed out once a day for a maximum of one hour. (*Id.* ¶ 88.) Inmates with a prescription could request to use the TENS unit consistent with their prescription level. (*Id.*) Bella's prescription allowed him to have the TENS unit twice a day. (*Id.*)

On June 24, 2015, the DOC approved Manlove's request to send Bella to the UW Pain Management Clinic. (*Id.* ¶ 51.)

In July 2015, Marshfield Clinic tested Bella for EDS types I, II, and IV. (*Id.* ¶ 25.) The result was negative. (*Id.*) The result definitely ruled out EDS types I, II, and IV, but it could not rule out EDS type III because there is no genetic testing available for EDS type III. (*Id.*)

On September 24, 2015, Manlove prescribed a six-month trial of Meloxicam for pain relief, based in part, on Bella's request for the medication. (*Id.* ¶ 53.) Bella later reported that he thought Meloxicam was causing mouth sores, so Manlove changed the prescription to Naproxen on November 19, 2015. (*Id.* ¶ 54.) Manlove renewed the prescription for Naproxen on April 12, 2016.

On January 15, 2016, Dr. Abd-Elsayed (from UW Pain Management Clinic) examined Bella. (*Id.* ¶ 55.) He diagnosed Bella with Myofascial pain, with bilateral shoulder, knee, and hip pain. (*Id.*) He recommended use of a TENS unit and lidocaine ointment 3-4

---

[1] WCI began controlling use of TENS units because inmates were able to convert the base of the unit into a tattoo machine or a "stinger," where the bare wires were used to conduct electrical current. (Docket # 68 at ¶¶ 82–83.)

times a day as needed. (*Id.*) Bella already had a prescription for the lidocaine ointment. (*Id.*) On January 22, 2016, Manlove re-prescribed the TENS unit, twice a day for one hour. (*Id.* ¶ 89.) Manlove renewed the prescription for the TENS unit on February 1, 2017 and increased the prescription to twice a day for two hours. (*Id.* ¶ 90.)

On July 6, 2016, Manlove met with Bella to discuss a list of items Bella had requested. (*Id.* ¶ 59.) After that appointment, Manlove prescribed Prednisone, Excedrin Migraine, Meloxicam, and Capsaicin cream. (*Id.*) Manlove also ordered a custom cane and requested replacement of Bella's worn braces. (*Id.*) Between April 2016 and May 2018, Bella received various replacement elbow, knee, shoulder, and back braces. (*See* Docket # 69-1 at 47, 53–54, 57–59, 63–67, 69–70, 88, 91, 93–95, 98, 102, 185–88, 233–38, 241–46.)

Manlove ordered an echocardiogram on June 15, 2017. (*Id.* ¶ 60.) He ordered a C-spine x-ray and an MRI of the lumbar spine on August 29, 2017. (*Id.* ¶ 61.) Both test results were "unremarkable." (*Id.* ¶¶ 60–61.)

In September 2017, Manlove ordered a trial of Celebrex, based again in part, on Bella's request. (*Id.* ¶ 67.) Manlove notes that Celebrex is not normally on the DOC formulary. (*Id.*) Manlove discontinued the TENS unit on November 28, 2017 because Bella said that it did nothing to help with his pain and he stopped using it. (*Id.* ¶ 91.) Manlove explains that overuse of the TENS unit can result in tolerance, which reduces its effectiveness. (*Id.* ¶ 81.)

On January 4, 2018, Manlove requested a consultation with UW Rheumatology. (*Id.* ¶ 62.) UW Rheumatology declined the consultation stating the EDS was not treated there. (*Id.*) Manlove then requested a consultation with UW Health Physical Medicine & Rehabilitation, but they too declined the consult because Bella was already being treated by UW Pain Management Clinic. (*Id.* ¶ 63.)

In May 2018, Jeanpierre began working at WCI as a "contract" doctor. (Docket # 77 at ¶¶ 8–9.) She renewed Bella's prescription for Lidocaine cream on May 8, 2018. (*Id.* ¶ 29.) Jeanpierre also refilled several other medications unrelated to Bella's EDS, but these other medications will not be discussed any further. (*Id.* ¶¶ 29–32, 35–36.)

Jeanpierre examined Bella for the first time on June 6, 2018 (*Id.* ¶ 33.) Jeanpierre noted that Bella's heart and lungs were "normal," but she ordered a CT scan of Bella's chest and pelvis to rule out an aneurysm. (*Id.* ¶ 34.) Jeanpierre explains that an aortic aneurysm can be a side effect of one type of EDS. (*Id.*) She also refilled his prescription for lidocaine cream. (*Id.* ¶ 35.) In July 2018, Bella complained that he could not sleep due to pain. (*Id.* ¶¶ 37-38.) Jeanpierre prescribed a sleep aid to resolve the issue because Bella was already taking two other pain medications. (*Id.*)

Jeanpierre examined Bella for a second time on August 8, 2018. (*Id.* ¶¶ 39-40.) The appointment was not related to EDS, but Bella's physical exam was "normal," and according to Jeanpierre, he did not appear to be in any acute distress at that time. (*Id.* ¶ 41.) The following day, on August 9, 2018, Bella submitted a Health Services Request stating that Jeanpierre was "refusing to treat [his] Ehlos Danlos Syndrome." (*Id.* ¶ 42.) Jeanpierre responded with a written description of what EDS is and how it affects the body, the four types of EDS, potential treatment options, and potential medication. (*Id.* ¶ 43.)

On August 12, 2018, Bella submitted a Health Services Request for ice. (*Id.* ¶ 44.) Jeanpierre approved the request the next day and ordered ice twice a day. (*Id.*) Later that month, Bella requested ice four times a day and Jeanpierre also approved that request. (*Id.* ¶ 46.)

On August 14, 2018, Bella went to Novacare for knee braces and wrist splints. (Docket # 68 at ¶ 77.) He received his splints on December 5, 2018. (*Id.*)

On August 21, 2018, Bella submitted two different Health Services Requests complaining that he was not getting adequate treatment for his EDS. (Docket # 77 at ¶ 47.) In response, Jeanpierre saw Bella for a third time on August 27, 2018. (*Id.* ¶¶ 48–49.) Following the appointment, Jeanpierre ordered labs to check his thyroid, a consultation with neurosurgery for pain management, a referral to psychiatry, Flexeril and Vicodin (for pain), and Magnesium Gluconate (for muscle spasms). (*Id.* ¶¶ 51–56.) Bella had both sets of lab work done on September 7, 2018. (*Id.* ¶ 59.)

On September 20, 2018, Bella reported that he was having chronic back pain. (*Id.* ¶ 60.) As a result, Jeanpierre saw Bella for the fourth and final time on October 4, 2018. (*Id.* ¶ 61.) Jeanpierre took Bella's vitals and performed a physical examination. (*Id.* ¶ 62.) According to Jeanpierre, Bella was not in acute distress. (*Id.*) Jeanpierre reordered Flexeril and contacted the pharmacy to ensure it would be promptly delivered. (*Id.* ¶ 63.) She also placed an order for Bella to have another CT scan on his abdomen and pelvis. (*Id.*) Bella later reported that he stopped taking the Flexeril due to unpleasant side effects, so Jeanpierre discontinued the medication on October 15, 2018. (*Id.* ¶ 65.) Both CT scans came back normal. (*Id.* ¶ 70.)

On October 25, 2018, Jeanpierre refilled the prescription for Lidocaine cream. (*Id.* ¶ 67.) Several days later, on October 29, 2019, she reviewed and sent Bella "prioprection" exercises. (*Id.* ¶ 68.) She refilled several other prescriptions on November 2, 2018. (*Id.* ¶ 69.) Jeanpierre refilled Bella's prescription for Lidocaine for the last time on April 11, 2019. (Docket # 77 at ¶ 72.) She has not treated Bella since April 2019. (*Id.* ¶ 73.)

On January 22, 2019, Dr. Abd-Elsayed (from the UW Pain Management Clinic) examined Bella again and concluded that he was a good candidate for lidocaine infusion therapy. (Docket # 77 at ¶ 71.) Bella received the lidocaine infusion on May 23, 2019. (Docket # 68 at ¶ 64.) Bella states that the infusion "helped a lot" with his pain but it has started to ware off as of July 3, 2019. (Docket # 86 at 26, ¶ 65.) Bella states that he's still in horrible pain. (*Id*.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). When considering a motion for summary judgment, the court takes evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A)-(B). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## ANALYSIS

Bella claims: (1) that Jeffery Manlove, Cheryl Jeanpierre, Emily Stadtmueller, Donna Larson, Nancy White, and Crystal Marchant showed deliberate indifference towards his serious medical condition by refusing to seek an "outside EDS specialist" for his Ehlers-Danlos Syndrome ("EDS"); (2) that the "current HSU manager" (Marchant) implemented a policy at WCI that forced inmates to share Transcutaneous Electrical Nerve Stimulator ("TENS") units and limited use to one hour; and (3) that Manlove, Jeanpierre, Stadtmueller, Larson, White, and Marchant provided negligent medical care under Wisconsin State law. (Docket # 8 at 5–7.) The defendants move for summary judgment on all of Bella's claims.

"[T]he Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). The court performs a two-step analysis, "first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Id.* at 727–28 (citing *Farmer v. Brennan*, 511 U.S. 825, 843 (1994)).

"The requirement of subjective awareness tethers the deliberate-indifference cause of action to the Eighth Amendment's prohibition of cruel and unusual punishment." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). "[T]he court looks into [a prison

official's] subjective state of mind." *Petties*, 836 F.3d at 728. A plaintiff need not show that the official intended harm or believed that harm would occur, but mere negligence is not enough. *Id*; *see also Whiting,* 839 F.3d at 662 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Even objective recklessness, failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known, is insufficient to make out a claim. *Petties*, 836 F.3d at 727. Instead, a plaintiff must provide evidence that an official actually knew of and disregarded a substantial risk of harm. *Id.*

In the prison medical care context, common examples of deliberate indifference include: (1) ignoring a request for medical assistance; (2) refusing to take instructions from a specialist; (3) persisting in a course of treatment known to be ineffective; (4) choosing an easier and less efficacious treatment without exercising medical judgment; and (5) delaying in treatment which serves no penological interest. *Petties*, 836 F.3d at 729–31. The court examines the totality of an inmate's medical care when analyzing deliberate indifference. *See Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997).

Bella first alleges that Manlove, Jeanpierre, Stadtmueller, Larson, White, and Marchant showed deliberate indifference towards his serious medical condition by refusing to seek the assistance of an "outside EDS specialist." (Docket # 8 at 5.) Regarding Stadtmueller, Larson, White, and Marchant, they were HSMs who did not have authority to order a referral to an outside provider or specialist. (*See* Docket # 68 at ¶ 14.) Only a doctor or an advanced practice nurse prescriber could order referrals to a specialist, and Bella does not dispute this. (*See* Docket # 86, ¶ 14.) Accordingly, Stadtmueller, Larson, White, and Marchant are entitled to summary judgment on Bella's claim that they refused to seek an "outside specialist" to treat his EDS.

Regarding Manlove and Jeanpierre, both parties agree that they are the individuals responsible for referring an inmate to an "outside EDS specialist." Contrary to Bella's assertions, however, Manlove timely requested consults with four different "outside specialists" from the UW health system. UW Orthopedics and UW Pain Management Clinic accepted Manlove's referrals and treated Bella several times between May 2015 and May 2019. UW Rheumatology and UW Health Physical Medicine & Rehabilitation declined Manlove's referrals because the correct medical department was already treating Bella. Neither Manlove nor Jeanpierre had any control over which "outside specialists" would agree to accept a referral or when an appointment would be available. Notwithstanding these ancillary issues, Bella's assertion that Manlove and Jeanpierre "refused" to seek an "outside EDS specialist" is contradicted by the evidence on the record.

Bella notes that Manlove and Jeanpierre should have referred him to the EDS specialist who treats his mother and sister. (Docket # 86 at 21, ¶¶ 3, 24.) However, "an inmate is not entitled to demand specific care." *Walker v. Wexford Health Sources, Inc.,* 940 F.3d 954, 965 (7th Cir. 2019) (quoting *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011)). Most individuals, even those who are not incarcerated, have some limitations on which medical care providers are available through their health care coverage plan. Manlove referred Bella to specialists available through the UW health system. Bella's assertion that doctors at UW health system are ill-equipped to treat EDS is unpersuasive and unsupported by the evidence on the record.

Bella further implies that the medical care he received at WCI was generally deficient. (*See* Docket # 83 and Docket # 85.) The 499 pages of medical documents he attached to his response materials show otherwise. (*See* Docket # 86.) Manlove and Jeanpierre responded to

Bella's requests for medical care by examining him in person numerous times, ordering and reviewing different types of diagnostic tests (labs, x-rays, EKGs, CT scans, an echocardiogram, and MRIs), prescribing different types of oral medication (Cymbalta, Nortriptyline, Meloxicam, Naproxen, Prednisone, Excedrin, Capsaicin, Celebrex, Flexeril, Vicodin, and Magnesium Gluconate), and prescribing different types of topical medication/physical aids (analgesic balm, TENS unit, physical therapy, lidocaine cream, a cane, braces/splints, and ice). They consulted two different UW specialists and followed the specialists' recommendations. When Bella complained that treatment was not working, they changed his prescription several times and even approved medications that he specifically requested.

Apart from Bella's request for opioids (which he cannot have because EDS pain is musculoskeletal and not neurogenic, *see* Docket # 68 at 65–66), it is unclear what medical treatment he wants that Manlove and Jeanpierre have denied without exercising medical judgment. Bella maintains that no one is listening to him and he continues to experience pain, but no reasonable jury can conclude that the totality of medical care he received at WCI was "so blatantly inappropriate as to evidence intentional mistreatment." *See Snipes v. De Tella*, 95 F.3d 586, 592 (7th Cir. 1996); *see also Walker*, 940 F.3d at 965 ("that [the plaintiff's] pain and other symptoms did not subside is not evidence of [the defendant's] deliberate indifference, especially considering that [the plaintiff] voluntarily stopped taking pain medication at some point and [the defendant] ordered a variety of therapies and requested several referrals to address [the plaintiff's] ongoing complaints."). Manlove and Jeanpierre are therefore entitled to summary judgment on this claim.

Bella next alleges that Marchant implemented a policy at WCI that forced inmates to share TENS units and limited use to one hour. (Docket # 8 at 6.) Marchant explains that former HSM Scarpita circulated a memo regarding control of TENS units, but that neither she nor Scarpita had ultimate decision-making authority over the content of the memo. Instead, management "at the highest levels of the Wisconsin Department of Corrections" make such decisions. Bella does not dispute this. (*See* Docket # 86 at 13, ¶¶ 94–100.)

Bella instead reframes his claim by asserting that Marchant "upheld an obviously ineffective TENS unit policy." (*See* Docket # 86 at 13, ¶ 94.) Bella is correct a nurse cannot blindly follow "questionable" practices and policies. *See Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010). As the Seventh Circuit has explained:

> As an ethical matter, a nurse confronted with an "inappropriate or questionable practice" should not simply defer to that practice, but rather has a professional obligation to the patient to "take appropriate action," whether by discussing the nurse's concerns with the treating physician or by contacting a responsible administrator or higher authority.

*Id.* (internal citation omitted). While WCI had a general policy limiting *recreational* use of TENS units for security reasons, it had an exception for inmates who had a prescription. Bella had a prescription and was allowed to use the TENS unit consistent with that prescription. Accordingly, Bella has no factual basis for asserting that WCI's TENS unit policy was so "obviously ineffective" that Marchant had an independent ethical duty to intervene on his behalf. Therefore, Marchant is entitled to summary judgment on Bella's claim that she implemented a policy at WCI that forced inmates to share TENS units and limited use to one hour.

Finally, Bella states that Manlove, Jeanpierre, Stadtmueller, Larson, White, and Marchant provided negligent medical care under Wisconsin state law. (Docket # 8 at 7.)

Because Bella cannot proceed past summary judgment on his federal claims against any of the defendants, I decline to take supplemental jurisdiction over his state law negligence claims. *See Groce v. Eli Lilly & Co.*, 193 F.3d 496, 500–01 (7th Cir. 1999). Accordingly, I will grant the defendants' motions for summary judgment and dismiss this case.

## MOTION FOR ORAL ARGUMENT

Bella asks for oral argument to "clarify any arguments/facts the courts would deem necessary so that they can fully understand the situation." (Docket # 84 at ¶ 2.) Because the parties' submissions sufficiently addressed the facts and law, I find oral argument unnecessary in this case. Therefore, Bella's motion for oral argument is denied.

**IT IS THEREFORE ORDERED** that defendants' motions for summary judgment (Docket # 66 and Docket # 75) are **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiff's motion for oral argument (Docket # 84) is **DENIED**.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See*

Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 14th day of February, 2020.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge